Richard B. Brualdi (RB-1304)
Gaitri Boodhoo (GB-0643)
Jon Martino (JM-1504)
Sue Lee (SL-4305)
**THE BRUALDI LAW FIRM**
29 Broadway, Suite 2400
New York, New York 10006
Telephone:(212) 952-0602
Facsimile:(212) 952-0608

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ OCT 24 2005 ★

**BROOKLYN OFFICE**

**CV  05  4951**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**SEYBERT, J.**

-----------------------------------------------------------------x
: 
LEMON BAY PARTNERS LLP, :
derivatively on behalf of DHB INDUSTRIES, INC. :
: 
Plaintiff, :
: **CASE NO.**
-against- :
: 
DAVID H. BROOKS, SANDRA HATFIELD, :
DAWN MARIE SCHLEGEL, CARY :
LAWRENCE CHASIN, JEROME KRANTZ, :
BARRY BERKMAN, GARY NADELMAN, and :
WEISER, LLP :
: 
Defendants, ::
-and- :
: 
DHB INDUSTRIES, INC., :
A Delaware Corporation, :
: 
Nominal Defendant. :
-----------------------------------------------------------------x

**BOYLE, M.J.**

**SHAREHOLDER VERIFIED DERIVATIVE COMPLAINT**

Plaintiff, by its attorneys, makes the following allegations for its derivative complaint, upon

personal knowledge as to paragraph 9, and upon information and belief derived from, *inter alia*, a

review of documents filed with the Securities and Exchange Commission ("SEC") and publicly available news sources, such as newspaper articles, as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of DHB Industries, Inc. ("DHB" or the "Company"), on behalf of nominal defendant DHB, against certain current officers of the Company (the "Officer Defendants"), certain members of the Company's Board of Directors (the "Director Defendants")(collectively the "Individual Defendants") and others asserting claims for insider trading, misappropriation of corporate information, abuse of control, unjust enrichment, violation of Section 14(a) of the Securities Exchange Act of 1934, breaches of fiduciary duties, aiding and abetting of breaches of fiduciary duties, breach of contract and professional negligence, which conduct materially damaged the Company.   Plaintiff seeks to redress these injuries suffered by the Company because the Company's directors will not do so.

2.      From November 18, 2003 through August 29, 2005 (the "Relevant Period"), the Individual Defendants caused DHB's shares to trade at artificially inflated levels, through the issuance of false and misleading financial statements and guidance.   Specifically, during the Relevant Period, the Individual Defendants' positive representations regarding the Company's fast growing business, disseminated in press releases and SEC filings, were materially false and misleading because they failed in part to disclose that the Company's bulletproof vests contained a substantial amount of Zylon fibers whose effectiveness at stopping bullets degraded over time. By the beginning of the Relevant Period, defendants knew, or recklessly disregarded, that vests containing Zylon could potentially fail to stop bullets because of fiber degradation, and that serious concerns about Zylon's use in body armor were growing in the law enforcement community.  Defendants, however, failed to warn investors of the risks that DHB's Zylon-based

2

products posed to the Company's business.  Specifically, defendants' representations during the

Relevant Period were materially false and misleading because they failed to disclose that:

    i.        The Company's body armor products containing Zylon were potentially dangerous because over time they fail to stop bullets due to Zylon-fiber degradation;

    ii.       Because of the foregoing, the Company was subject to massive regulatory, criminal and civil liability; and

    ii.       The Company's business was at risk given that its products containing Zylon were vulnerable to decertification from the National Institute of Justice (the "NIJ"), which would have a materially negative impact on the Company's business given that certification was required by many of DHB's customers.

    3.      While the price of the Company's securities was artificially inflated because of

defendants' failure to disclose the Zylon fiber degradation issue, DHB insiders, including six of

the Company's seven directors, sold over 11 million shares of the Company's stock reaping

profits in excess of $200 million.

    4.      The truth about Zylon was not acknowledged by the Company until the National

Institute of Justice issued a notice to the Company, effective August 24, 2005, in which it

advised that it had identified Zylon as "a material that appears to create a risk of death or serious

bodily injury as a result of degraded ballistic performance when used in body armor."  Only then,

on August 30, 2005, before the opening of trading, did DHB issued a press release stating  that

"[t]he Company has ceased production of all Zylon-containing bullet resistant products due to

the National Institute of Justice's (NIJ) decision to revoke the NIJ's previously issued

certifications of all vests containing Zylon in the marketplace." In addition, the Company also

announced that it will be implementing a Voluntary Replacement Program to assist its customers

who presently have non NIJ-compliant Zylon body armor and that it will record a charge to third

quarter earnings to account for the anticipated cost of the Zylon Replacement Program and

discontinued sales of products that contain Zylon of up to $60 million.

5.    On this news, the price of DHB common stock plummeted 23%, from $6.66 per share on August 29, 2005 to $5.10 per share on August 30, 3005, on high trading volume. DNB's stock price continued to decline, falling to $4.58 by the close of August 31, 2005. Notably, insiders sold their shares during the Relevant Period at an average price of $19.51 per share.

6.    The Individual Defendants used the window of opportunity created by the artificial inflation of the Company's price to personally profit at the expense of DHB and its public shareholders by, *inter alia*, selling over 200 million dollars worth of DHB's stock which they had previously held.  By using non-public corporate information for personal profit, the Individual Defendants breached their fiduciary duties to DHB.  Further, during the Relevant Time, the Individual Defendants issued proxy statements to DHB's public shareholders that were materially misleading and/or omitted material information in violation of Section 14(a) of the 1934 Securities Exchange Act and Rule 14(a)(9) promulgated thereunder.  As a result of Defendants' wrongful conduct as alleged herein, the Company has been named in several securities class action lawsuits and has been exposed to millions of dollars in potential liability. Also, as a result of defendants' wrongful conduct, the Individual Defendants have impermissibly profited from their insider trading and DHB has suffered irreparable harm to its name and reputation caused by the unflattering publicity and lawsuits.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this shareholder derivative action pursuant to 28 U.S.C §1331 because it involves a federal claim pursuant to Section 14(a) of the Securities Exchange Act of 1934.  Supplemental jurisdiction over plaintiff's non-federal claims is proper

4

pursuant to 28 U.S.C. §1367. Further, this Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

8.    Venue is proper in this District pursuant to 28 U.S.C. 1391, among other reasons, because the Nominal Defendant's principal executive offices are located within this district at 200 Clarendon Street, P.O Box 9130, Boston, Massachusetts 02116, and because many of the acts alleged and complained about herein occurred substantially in this District.

## PARTIES

9.    Plaintiff Lemon Bay Partners LLP, a Florida limited liability partnership, owns DHB common stock and has done so at all relevant times.

10.    Nominal Defendant DHB has its principal executive offices at 555 Westbury Avenue, Carle Place, New York, 11590. DHB was incorporated as a Delaware corporation in 1992 and changed its name from DHB Capital·Group Inc. to DHB Industries, Inc. in July 2001. DHB is a holding company which manufactures and markets protective body armor and athletic apparel and equipment. DHB is publicly traded on the American Stock Exchange ("AMEX") under the symbol "DHB." As of August 5, 2005, the Company had approximately 45,377,575 shares of Common Stock outstanding.

11.    The following persons who are named as defendants in this complaint are, and at all relevant times have been, directors and/or officers of DHB:

a.    Defendant David H. Brooks ("Brooks") has served as the Chairman or Co-Chairman of the Company since he founded the Company in 1992. Brooks has also served as the Chief Executive Officer of the Company since July 2000, having previously

5

served in that capacity prior to September 1998. In addition, Brooks serves as Chairman of the Board, President and a Director of Brooks Industries of L.I., Inc., a privately held venture capital firm. Brooks is believed to be a citizen of New York. Because of his position with the Company, Brooks had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business prospects. *During the Relevant Period, Brooks sold approximately 10,879,275 shares of the Company's common stock for proceeds of over $194.5 million.*

b. Defendant Dawn M. Schlegel ("Schlegel") has been the Chief Financial Officer of the Company since September 1999. Schlegel has also served as Treasurer and Secretary of the Company since September 1999, and was elected a Director as of July 2000. Prior thereto, Schlegel served as the Company's Accounting Manager. Prior to joining DHB, Schlegel was a Senior Accountant with Israeloff, Trattner & Co. CPAs, P.C., a certified public accounting firm, for more than five years where she managed audits of middle market companies and her duties included auditing, compilation and review of financial statements, taxes, and general accounting. Schlegel is believed to be a citizen of New York. Because of her position with the Company, Schlegel had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business prospects. *During the Relevant Period, Schlegel sold approximately 149,503 shares of the Company's common stock for proceeds of over $2.9 million.*

c. Defendant Jerome Krantz ("Krantz") has served as a director of the Company since July 2000. Krantz has been the owner of and employed with Krantz Financial Group for over five years, and has over 25 years of experience in the insurance and financial industry. In addition, Krantz is a chartered life underwriter, a chartered financial consultant, and

6

a registered investment advisor. Krantz currently serves as Chairman of the Audit and Compensation Committees of the Board of Directors. Krantz is also the Audit Committee financial expert. Krantz is believed to be a citizen of New York. Because of his position with the Company, Krantz had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business prospects. *During the Relevant Period, Krantz sold approximately 116,226 shares of the Company's common stock for proceeds of approximately $2.2 million.*

d.      Defendant Gary Nadelman ("Nadelman") has served as a director of the Company since July 2001. Nadelman also serves on the Audit and Compensation Committees of the Board of Directors. Nadelman is believed to be a citizen of New York. Because of his position with the Company, Nadelman had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business prospects. *During the Relevant Period, Nadelman sold approximately 103,374 shares of the Company's common stock for proceeds of over $2 million*

e.      Defendant Cary Chasin ("Chasin") has served as a director of the Company since October 2002. Chasin was also an employee of the Company from November 1999 through April 2000, working on special projects including the closing of the hard armor division.      Chasin has over 30 years experience in owning and operating apparel retail, manufacturing and importing businesses. Chasin serves on the Audit and Compensation Committees of the Board of Directors. Chasin is believed to be a citizen of New York. Because of his position with the Company, Chasin had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business

7

prospects. *During the Relevant Period, Chasin sold approximately 108,496 shares of the Company's common stock for proceeds of over $2 million.*

   f. Defendant Barry Berkman ("Berkman") has served as a director of the Company since February 2003. Berkman is believed to be a citizen of New York. Because of his position with the Company, Berkman had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business prospects. *During the Relevant Period, Berkman sold approximately 44,620 shares of the Company's common stock for proceeds of approximately $864,848.*

   g. Defendant Sandra L. Hatfield ("Hatfield") served as Chief Operating Officer of the Company from December 2000 until August 2005. On August 11, 2005, Hatfield became the head of government and special project sales for the Company. Hatfield is believed to be a citizen of New York. Because of her position with the Company, Hatfield had access to and knowledge of adverse, material, non-public information regarding DHB's business and finances and present and future business prospects. *During the Relevant Period, Hatfield sold approximately 269,545 shares of the Company's common stock for proceeds of over $5.2 million*

  12. Defendants Brooks, Krantz, Berkman, Chasin, Nadelman and Schlegel comprise a majority of the Company's seven current directors and are referred to herein as the "Director Defendants." Defendants Hatfield, Schlegel and Brooks are referred to herein as the "Officer Defendants." Defendants Brooks and Schlegel are both Director Defendants and Officer Defendants. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants.

  13. Defendant Weiser LLP ("Weiser") is a New York limited liability partnership that

8

provides accounting, auditing, tax, management information, and financial advisory services to business owners and high net worth individuals. Weiser served as the Company's outside auditor for part of the Relevant Period. Weiser has offices in New York City, Long Island, Westchester, and Edison, New Jersey.

## DUTIES AND OBLIGATIONS OF THE INDIVIDUAL DEFENDANTS

14.     The Individual Defendants, because of their positions as members of the Company's Audit Committee, directors and/or senior officers of the Company possessed the power and authority to control the contents of DHB's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

15.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of DHB, were and are fiduciaries of the Company and under the common law owed the Company the highest obligation of loyalty, due care, good faith and full and fair disclosure. The Individual Defendants breached fiduciary duties owed by them to DHB under the common law by misappropriating corporate information for their personal benefit.

9

The Individual Defendants collectively reaped millions of dollars of insider trading benefits while in possession of material, adverse information regarding the Company's business prospects without disclosing that information about DHB to the investment community.

## DERIVATIVE ALLEGATIONS

16.    Plaintiff brings this action as a derivative action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of and for the benefit of DHB.

17.    Plaintiff will fairly and adequately represent the interests of DHB in enforcing and prosecuting its rights, and has retained competent counsel experienced in this type of litigation to prosecute this action.

## DEMAND IS FUTILE

18.    Under the facts and circumstances alleged in this Complaint, any demand upon the Company's Board of Directors is excused and is inevitably futile because a reasonable doubt has been raised either as to the Individual Defendants' disinterest and/or independence or whether the Individual Defendants exercised proper business judgment in participating or approving the wrongful activities alleged herein, for at least the following reasons:

(a)    The Individual Defendants, who constitute a majority of DHB's Board of Directors, engaged in illegal activities including, but not limited to, insider trading, that were completely unrelated to any corporate purpose and were solely beneficial to the Individual Defendants, at the Company's expense and detriment. A majority of the members of the Board as of the time this suit was filed directly benefited from the inception and continuance of the wrongful activities alleged herein, including the dissemination of false financial information, and received a direct personal financial gain not received by all DHB shareholders, by selling millions of dollars of DHB stock into the inflated market they had created with their false and

misleading statements as to DHB's true financial condition. The Individual Defendants made these sales (i) at a time when they knew or should have known of materially adverse information, and (ii) through the use of the Company's proprietary internal information that was misappropriated by the Individual Defendants for their own benefit. As a result of these wrongful activities, the Individual Defendants breached their duty of loyalty to the Company and exposed themselves and the Company to substantial monetary liability, thereby rendering the Individual Defendants interested for demand purposes.

(b)     The Individual Defendants were intimately and personally involved in the wrongdoing by authoring, approving and/or disseminating materially false and misleading statements. The Individual Defendants' self-interest arises out of the ultimate goal, which was to gain advantage from the artificial inflation of the value of the stock and stock options held by them. This wrongdoing, which had no legitimate corporate purpose, enabled the Individual Defendants to *collectively sell over 11 million shares of the Company's stock during the Relevant Time, reaping over $200 million in proceeds from their insider trading*, at the expense of the Company and its shareholders. It follows that the Individual Defendants, a majority of whom remained interested in assuring that the revelations of the wrongful practices did not depress the value of their stock and stock options, or lead to their own personal liability, are not competent to review a shareholder's demand for corporate action.

(c)     The Individual Defendants either fostered the wrongful practices described herein or took no action to insure that these wrongful activities ceased. The Individual Defendants knew or should have known of the wrongful acts at issue due to their positions as directors and/or senior officers. However, as a result of their desire to further their own personal gain and/or being dominated and controlled by other defendants, the Individual Defendants have

11

demonstrated through their actions and inactions their inability to act independently and without interest on a demand request from stockholders.

(d)     Because of their knowledge of and participation in the illegal practices alleged herein, the Individual Defendants are in no position to prosecute this shareholder derivative action. Each of them has an irreconcilable conflict regarding the prosecution of this action, and thus cannot exercise the requisite disinterestedness and independence to make a good faith business judgment since the wrongful acts at issue constitute violations of the fiduciary duties of loyalty and care of the Board and these acts are not subject to the so-called "business judgment rule";

(e)     The Individual Defendants engaged in illegal acts including, but not limited to, insider trading, that are not ratifiable. Because the Individual Defendants' actions were illegal and non-ratifiable, demand is excused as a matter of law;

(f)     The Individual Defendants failed to exercise proper business judgment by authoring, approving and/or disseminating materially false and misleading financial statements. This wrongdoing served no corporate purpose. The Director Defendants cannot properly consider a shareholder demand since their actions were outside the proper exercise of business judgment;

(g)     The Individual Defendants cannot defend their actions by any alleged business judgment in seeking to have this action dismissed or by not bringing this action against themselves and their business associates, because it would undoubtedly be to the benefit of DHB and to the detriment of the Individual Defendants to recover the damages caused by the Director Defendants and to assert these derivative claims.

## SUBSTANTIVE ALLEGATIONS

### The Company

19.     The Company, founded in 1992 by defendant Brooks, is organized as a holding company with two divisions: DHB Armor Group (the "Armor Group") and DHB Sports Group (the "Sports Group"). The Armor Group manufactures and provides bullet and projectile-resistant garments, and fragmentation protective vests, slash and stab protective armor, and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as governmental agencies. The Sports Group manufactures and distributes protective athletic apparel and equipment, including a wide variety of knee, ankle, elbow, wrist and back supports and braces that assist serious athletes, weekend sports enthusiasts, and general consumers in their respective sports and everyday activities. The Armor Group represented approximately 98%, 97% and 96% of the Company's consolidated revenues during 2004, 2003, and 2002, respectively. The balance of the consolidated revenues are attributable to the Sports Group. A majority of the Company's revenues are dependent upon U.S. government contracts. The Company's products are sold domestically to the U.S. military, state and local law enforcement agencies, correctional facilities, federal agencies and distributors and are sold internationally to governments and distributors. Sales to the U.S. military, directly or as a subcontractor accounted for 76%, 64% and 57% of the Company's Armor Group's revenues for the years ended December 31, 2004, 2003 and 2002, respectively. Sales directly and indirectly to domestic state and local law enforcement agencies, security and intelligence agencies, distributors and federal and state correctional facilities, accounted for 21%, 35% and 42% of the Armor Group's revenues in the years ended December 31, 2004, 2003 and 2002, respectively.

13

20.     Because most of its products are purchased by municipal police departments and the U.S. Military, the Company's products are subject to strict testing and certification by the National Institute of Justice (the "NIJ") -- the research, development, and evaluation agency of the U.S. Department of Justice. Maintaining NIJ certification is crucially important for the Company's business because many law enforcement agencies will not purchase non-NIJ certified body armor.

21.     On April 19, 2005, the Company filed an 8K with the SEC in which it revealed that, effective April 13, 2005, it had amended its Bylaws to *decrease the quorum requirement for all meetings of stockholders from a majority of the outstanding shares of each class of stock entitled to vote at such meeting to one-third of the outstanding shares* of each class of stock entitled to vote at such meetings.  In effect, the Company's management can call a shareholder's meeting at short notice, with resolutions proposed and passed without the need for the majority of shareholders being present to say the meeting is valid.

## The Individual Defendants Blatantly Disregarded Widespread Concerns About Zylon While Other Body Armor Manufacturers Move To Mitigate Damages from the Continued Usage of Products Containing Zylon

22.     Zylon is a trademarked name for a range of thermoset polyurethane materials manufactured by the Toyobo Corporation. Zylon is used in a number of applications that require very high strength with excellent thermal stability.  Zylon also gained wide use in body armor, including bullet-proof vests, in 1998.  However, beginning in 2001, there became numerous concerns regarding the efficacy of Zylon, namely that over time it degrades thereby leaving wearers of Zylon-constructed bullet-proof vests vulnerable.     Toyobo Corporation, the manufacturer of Zylon, dismissed those concerns.     Nevertheless, certain body armor manufacturers took precautionary measures to mitigate against problems in Zylon.  For example,

14

in January 2003, US Armor released a statement regarding Zylon-based vest, stating in part, as

follows:

> *Over the last 1½ years, we have been aware of serious concerns regarding Zylon losing its ballistic strength in a relatively short amount of time when exposed to a combination of heat and humidity. One of the more disturbing aspects of these issues is that almost all of the information and research data that is in support of strength degradation in Zylon has come directly from Toyobo Corporation in Japan, who is the manufacturer of Zylon fibers.* Additional data supporting the information regarding Zylon fiber performance problems along with overt cautions and conditional requirements of woven Zylon product purchasing has been obtained from two of the larger ballistic weaving companies, Hexel-Schwebel and Barrday.
>
> \*\*\*\*\*\*\*\*\*
>
> U.S. Armor Corporation has commissioned an independent laboratory to conduct accelerated age testing on Zylon fibers. We are midway through the testing cycle, and will provide you with those results as soon as they are available.
>
> It is for the reasons outlined above that *we have decided that it would be irresponsible for us to produce any Zylon-based armor products at this time*. (Emphasis added).

23.     On November 17, 2003, Attorney General John Ashcroft announced that the NIJ

has issued two status reports to the Attorney General containing results from the body armor

studies which highlighted the following findings:

- ■    *Ballistic-resistant material, including Zylon®, can degrade due to environmental factors, thus reducing the ballistic resistance safety margin that manufacturers build into their armor designs.*

- ■    The ultimate tensile strength of single yarns removed from the rear panel of the Forest Hills armor was up to 30-percent lower than that of yarns from "new" armor supplied by the manufacturer. Artificially-aged armor of the same type that failed in the Forest Hills incident was ballistically tested, but no bullet penetrations occurred.

- ■    The upgrade kits tested did not appear to bring used armor up to the level of performance of new armor. However, used armors with upgrade kits performed better than the used armors alone.

The NIH also indicated that:

> Although these results do not conclusively prove that all Zylon®-containing body armor models have performance problems, *the results clearly show that used Zylon®-containing body armor may not provide the intended level of ballistic resistance.* In addition, the results imply that a visual inspection of body armor and its ballistic panels does not indicate whether a particular piece of Zylon®-containing body armor has maintained its ballistic performance.
>
> Part of the Body Armor Safety Initiative entailed an applied research component that examined material properties of Zylon® in order to understand the causes of the ballistic failures. *Zylon® fibers show a systematic loss in tensile strength, tensile strain, and ballistic performance correlated with the breakage of specific bonds in the chemical structure of the material.*

24.     Further, since 2004, a number of class actions suits by private individuals and states, including Arizona, Arkansas, Massachusetts, Pennsylvania, Minnesota, Connecticut, and Texas, have been initiated against body armor manufacturers, including Second Chance Body Armor, alleging that these companies sold vests that deteriorate and endanger police officers.

25.     Similarly, certain body armor manufacturers have discontinued products containing Zylon. For example, On April 16, 2004, Second Chance Body Armor announced that it will no longer manufacture the Tri-Flex body armor because of concerns regarding "Zylon fiber performance durability."

26.     On August 24, 2005, the NIJ issued its "*Third Status Report to the Attorney General on Body Armor Safety Initiative Testing and Activities*" (the "NIJ Third Status Report") which confirmed that the concerns over Zylon were justified. Specifically, the NIJ Third Status Report found that *bullets fired in government tests penetrated more than half the police body armor vests containing Zylon.* The tests also showed that *vests made with Zylon lose strength over time*, well before their standard five-year warranty expires and even when the armor

16

appears to be in good condition. As a result, the government announced that it would no longer

help local police forces pay for bullet-resistant vests that contain any Zylon.

## The Materially False and Misleading Statements

27.     Despite concerns about the durability of Zylon and the potential impact that its

continued usage will have on the Company, the Individual Defendants refused to publicly

acknowledge that there was a problem and continued to mislead investors by making the

statements below.

## March 2004

28.     On March 15, 2004, DHB issued a press release entitled, *"DHB Industries*

*Fourth Quarter Revenues Increase 124% To a Record $72.9 Million."* The press release stated

in pertinent part as follows:

> For the fourth quarter ended December 31, 2003, DHB reported record
> revenues of $72,916,000, an increase of 124% as compared to revenues
> of $32,548,000 for the fourth quarter of 2002. Operating income
> increased 127% in the fourth quarter to $5,327,000 as compared to
> $2,346,000 in the fourth quarter of 2002. Fourth quarter 2003 income
> available to common stockholders was $2,762,000 or $0.06 per diluted
> share, as compared to $5,723,000, or $0.13 per diluted share in the
> fourth quarter of 2002.
>
> Dawn Schlegel, CFO of DHB Industries, commented "The Company's
> record operating performance in 2003 was a result of a 103% increase
> in sales to the military as well as *a 61% increase in sales to state and
> local law enforcement agencies.* The balance sheet continued to
> strengthen as shareholders' equity increased by 49% and the Company
> realized positive cash flow from operations. Whereas operating income
> in 2003 hit record levels, earnings per share in 2003, as compared to
> 2002, were slightly lower due primarily to an overall increase in tax
> expense totaling $14.8 million."
>
> David Brooks, Chairman and CEO of DHB industries, added: "*DHB
> Industries continues to build upon its dominant position in the
> protective soft body armor industry.* We maintain a commanding
> share of the military market as well as the domestic law enforcement
> and federal agencies market. In December, we implemented proactive

17

efforts to penetrate markets outside the United States. We believe foreign markets could be substantial and *offer* a considerable growth opportunity for DHB's renowned body armor product line. *The future outlook for DHB appears outstanding* given the continuing unstable geopolitical environment, the increased need for homeland security, and the continuing war on terror."

Guidance and Outlook

The record demand that DHB experienced for its products in 2003 has continued into 2004. Given current visibility, the Company expects to report record revenues and earnings for the first quarter of 2004. Moreover, it expects first quarter SG&A expenses to decline to between 13.5% - 14.5% and a tax rate of approximately 42%.

29.     On April 29, 2004. DHB issued a press release entitled *"DHB Industries*

*Announces $215+ Million Backlog."* Defendant Hatfield noted that demand for the Company's

"life-saving" products was growing at a record pace:

Commenting on the announcement, Sandra Hatfield, Chief Operating Officer of DHB Industries, said, "The demand for the Armor Group's products continues at an unprecedented pace. We continue to receive new purchase orders from every market sector, reflecting the strength of DNB's technology, products and our ability to handle very large volumes. Our expansion efforts are clearly showing early dividends as we continue to provide exceptional life-saving products that exceed the requirements and expectations of our customers while providing unparalleled levels of service and support."

30.     On May 6, 2004, DHB issued a press release entitled, *"DHB Industries*

*Announces Record First Quarter Revenue Of $74.4 Million and Record Earnings of $0.14 Per*

*Share."*   The press release stated in pertinent part:

*DHB Industries, Inc., the market leader in the rapidly growing body armor industry*, today announced record revenues and earnings for the first quarter ended March 31, 2004, posting its 17th consecutive year-over-year increase in quarterly revenues. The current backlog of firm orders in hand has dramatically increased to an unprecedented $215 million.

For the first quarter ended March 31, 2004, DHB reported record

18

revenues of $74,403,000, an increase of 61% as compared to revenues of $46,153,000 for the first quarter of 2003. Operating income increased 52% in the first quarter to $10,893,000 as compared to $7,175,000 in the first quarter of 2003. First quarter 2004 income available to common stockholders was $6,269,000 or $0.14 per diluted share, as compared to $4,929,000, or $0.12 per diluted share in the first quarter of 2003. The effective tax rate for the first quarter of 2004 was 39.5% as compared to 33.9% in the first quarter of 2003.

31.    Defendant Brooks lauded the Company's results, stating as follows:

> *DHB Industries' leading position in the protective soft body armor industry has never been more pronounced.* In the past six months, DHB has received two significant contracts for body armor from the United States Military, $60 million and $77 million, each of which the Company believes was the largest single contract for body armor ever awarded by the U.S. Department of Defense at the time of award. To date, our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 600,000 Interceptor Outer Tactical Vests to the US military."

32.    On August 5, 2004, DHB issued a press release entitled, *"DHB Industries Announces Record 2nd Quarter Revenue of $86 Million and Record Earnings of $0.17 Per Share."* The press release stated in pertinent part:

> *DHB Industries, Inc., the market leader in the rapidly growing body armor industry*, today announced record revenues and earnings for the second quarter ended June 30, 2004, posting its 18th consecutive year over-year increase in quarterly revenues. The current backlog exceeds $393 million, an 83% increase from the $215 million backlog reported with the Company's first quarter results on May 6, 2004.
>
> For the quarter ended June 30, 2004, DHB reported record revenues of $86,066,000, an increase of 52% as compared to revenues of $56,525,000 for the second quarter of 2003.
>
> Operating income increased 68% in the second quarter to a record $12,990,000 as compared to $7,751,000 in the second quarter of 2003. Second quarter 2004 income available to common stockholders was a record $7,570,000 or $0.17 per diluted share, a 91% increase as compared to $3,961,000, or $0.09 per diluted share in the second quarter of 2003. The *effective* tax rate for the second quarter of 2004 was 39.1% as compared to 45.4% in the second quarter of 2003. Weighted shares outstanding on a diluted basis for the second quarter of 2004 were 45,739,277 as compared to 44,235,879 for the second

19

quarter of 2003.

David Brooks, Chairman and CEO of DHB Industries, added, *"DHB Industries continues to experience extraordinary growth as order activity from all four sectors of business - military, law enforcement, federal agencies and international - has been expanding at a rapid pace for more than a year.* Over the past ten months, DHB has announced new contracts and purchase orders totaling more than $415 million. To date, our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 750,000 Interceptor Outer Tactical Vests to the US military. We believe the fixture outlook for DHB and its industry leading soft body armor products remains exceptionally strong."

Guidance and Outlook:

DHB continues to experience accelerating demand for its industry-leading protective soft body armor products. The Company is raising its previous guidance, and now expects revenues of at least $300 million for the full 2004 year.

33.     On November 9, 2004, DHB issued a press release entitled, *"DHB Industries*

*Achieves Record Third Results."* The press release stated in pertinent part:

> *DHB Industries Inc., the market leader in the rapidly growing body armor industry,* announced today record revenues and earnings for the third quarter ended September 30, 2004, posting its 19th consecutive year-over-year increase in quarterly revenues. The current backlog of firm orders exceeds $365 million.
>
> For the third quarter ended September 30, 2004, DHB reported record revenues of $89,410,000, an increase of 64% as compared to revenues of $54,417,000 for the third quarter of 2003. Operating income increased 130% in the third quarter of 2004 to a record $13,282,000 as compared to $5,763,000 in the third quarter of 2003. Third quarter 2004 income available to common stockholders was a record $8,058,000 or $0.18 per diluted share, a 157% increase as compared to $0.07 per diluted share, or $3,160,000 in the third quarter of 2003. The effective tax rate for the third quarter of 2004 was 36.6% as compared to 40.7% in the third quarter of 2003. Weighted shares outstanding on a diluted basis for the third quarter of 2004 were 45,962,109 as compared to 44,510,790 for the third quarter of 2003.
>
> Sandra Hatfield, COO of DHB Industries, commented, *"We continue to meet or exceed all of our internal operating and performance goals. Our base of business is strengthening in all segments --*

20

> *military, state and local law enforcement, and federal agencies and*
> *we believe we are increasing market share in all segments.* We are
> especially encouraged by substantial orders we have recently received
> that are either for new products or are from new customers. Lastly, we
> are extremely excited about the prospects of a number of R&D
> initiatives as well as new products currently in either prototype or field
> testing stage."

> David Brooks, Chairman and CEO of DHB Industries, added, "Our
> strength, commitment and leadership position within the body armor
> industry is extremely strong. Over the past year, DHB has announced
> new contracts and purchase orders totaling more than $525 million. As
> of September 30, 2004, our Point Blank subsidiary, providing life-
> saving protection for our troops, has shipped more than 800,000
> Interceptor(TM) Outer Tactical Vests to the US military. The surging
> operating performance and earnings leverage of the Company is
> largely a result of the significant investments we made over the past
> three years in R&D, expanding our manufacturing capacity by opening
> two new facilities totaling over 150,000 square feet, and significantly
> increasing our base of versatile employees. As we look to the future
> outlook of DHB, I can only say, this is just the beginning, the future is
> ours."

> Guidance and Outlook:

> DHB continues to experience accelerating demand for its industry-
> leading protective body armor products. The Company is raising its
> previous guidance, and now expects revenues of at least $330 million
> for the full 2004 year.

34.     However, despite these statements regarding the Company's performance and its

potential for future growth, the Individual Defendants intensified their sales of the Company's

common stock. Indeed, on November 29, 2004 alone, defendant Brooks sold 4.7 million shares

at $18.9 per share. The insider sales are detailed below.

35.     On March 16, 2005, DHB issued a press release entitled, *"DHB Industries Posts*

*Record Fourth Quarter Results."* The press release stated in pertinent part.

> DHB Industries Inc., a provider of body armor to the military, law
> enforcement and federal agencies, announced today record revenues
> and earnings for the fourth quarter and full-year ended December 31,
> 2004, posting its 20th consecutive year-over-year increase in quarterly

21

revenues. The current backlog of firm orders exceeds $415 million.

For the fourth quarter ended December 31, 2004, DHB reported record revenues of $90,196,000, an increase of 24% as compared to revenues of $72,916,000 for the fourth quarter of 2003. Gross margins for the fourth quarter of 2004 were 27.3% versus 27.5% in the fourth quarter of 2003. Selling, general and administrative expenses ("SG&A expenses") for the fourth quarter of 2004 were 13.5% of net sales versus 20.2% of net sales for the fourth quarter of 2003.

David Brooks, Chairman and CEO of DHB Industries, added, "During the 2004 full year, DHB announced new contracts and purchase orders totaling approximately $544 million. We have seen our backlog increase over the past three years from $57 million in March 2003, to $132 million in March 2004, to $415 in March 2005. Our Point Blank subsidiary, providing life-saving protection for our troops, has shipped more than 850,000 Interceptof™ Outer Tactical Vests to the U.S. military. Whereas our recent growth has been exceptional, we seek additional opportunities to both expand existing market share and enter new geographic markets."

Guidance and Outlook

Given our existing backlog and the current demand for our products, we anticipate revenues will increase in 2005 as compared to 2004.

36.     On March 17, 2005, DHB filed its annual report on Form 10-K with the SEC,

signed by defendants Brooks and Schlegel, among others. The Form 10-K reiterated the

financial results reported previously in the Company's earnings press releases.

37.     The Form 10-K did not warn of the potentially ruinous risks that the Company

was subject to because of its Zylon vests. Instead, defendants warned that shortages of raw

materials used in its products, such as Zylon, could cause problems for DHB's business:

> *A substantial majority of our revenues and net income is dependent upon the sale of the ballistic-resistant products of our Armor Group. The raw materials used by our Armor Group in the manufacturing of our ballistic-resistant products include* Kevlar(TM), Twaron(TM) Spectra(TM) and *Zylon(TM)* and our primary shield products include GoldFlex(TM), Dyneema(TM) and Spectra Flex(TM). Substantially all of the raw materials used in the manufacturing of our ballistic-resistant products consist of fabricswhich are patented by major

22

> corporations which are purchased from four independent weaving or manufacturing companies. Accordingly, we have limited sources of such required raw materials for our ballistic-resistant products. During 2002 and 2003, shortages of such required raw materials limited the quantity of products of our Armor Group that we could produce, and demand for such products exceeded that amount. Although we were able to partially mitigate the impact of these raw materials shortages by using a variety of ballistic fibers, instead of one type of fiber, the impact of the shortages was not completely eliminated because there are also limits on the availability of ballistic fiber blends.

38. Defendants also included the generalized warning that its products were

inherently risky and could give rise to product liability and other claims:

> THE PRODUCTS WE SELL ARE INHERENTLY RISKY AND COULD GIVE RISE TO PRODUCT LIABILITY AND OTHER CLAIMS FOR WHICH WE MAY NOT BE ABLE TO OBTAIN ADEQUATE INSURANCE.
>
> The products that we manufacture are typically used in applications and situations that involve high levels of risk of personal injury. Failure to use our products for their intended purposes, failure to use them properly, their malfunction, or, in some limited circumstances, even correct use of our products, could result in serious bodily injury or death. We cannot assure you that our insurance coverage would be sufficient to cover the payment of any potential claim. In addition, we cannot assure you that our current insurance or any other insurance coverage will continue to be available or, if available, that we will be able to obtain it at a reasonable cost. Our cost of obtaining insurance coverage has risen substantially since the terrorist attacks of September 11, 2001. Any material uninsured loss could have a material adverse effect on our business, financial condition and results of operations.

39. In the section of the Form 10-K discussing relevant lawsuits, the Company noted

that in January 2005 a police organization filed a class action suit alleging problems with Zylon

vests. The suit was settled a month later:

> On January 3, 2005, a class action lawsuit was filed against us in the Circuit Court of the Seventeenth Judicial Circuit in Broward County, Florida by a police organization and individual police officers,

23

> because of concerns regarding the effectiveness and durability of body armor with high concentrations of Zylon in the Company's bullet-resistant soft body armor (vests). In February 2005, we reached a preliminary settlement with respect to the class action lawsuit filed, subject to final court approval. The Company does not expect this settlement to have a material adverse effect on its financial position.

40.     The Form 10-K contained certifications, signed by defendants Brooks and Schlegel, respectively, representing, among other things, that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

41.     The statements referenced above in paragraphs 28-40 were each materially false and misleading because they failed to disclose the following facts, among others:

   i.    The Company's body armor products containing Zylon were potentially dangerous because over time they fail to stop bullets due to Zylon-fiber degradation;

   ii.   Because of the foregoing, the Company was subject to massive regulatory, criminal and civil liability; and

   iii.  The Company's business was at risk given that its products containing Zylon were vulnerable to decertification from the National Institute of Justice (the "NIJ"), which would have a materially negative impact on the Company's business given that certification was required by many of DHB's customers.

42.     Further, defendants Brooks and Schlegel's express assurances that the Form 10-K was free from materially false and misleading statements were untrue because of the above-noted misrepresentations. Such assurances were themselves deceptive and provided false comfort to investors.

43.     On May 5, 2005, DHB issued a press release entitled, *"DHB Industries Reports First Quarter Results."* The press release stated in pertinent part:

24

For the first quarter ended March 31, 2005, DHB reported record first quarter revenues of $85,465,000, an increase of 14.9% as compared to revenues of $74,403,000 for the first quarter of 2004. Operating income increased 15.4% in the first quarter of 2005 to a record for the first quarter of $12,571,000 as compared to $10,893,000 in the first quarter of 2004. First quarter 2005 income available to common stockholders was $7,619,000, a 21.5% increase as compared to $6,269,000 in the first quarter of 2004. First quarter 2005 earnings per share was $0.17 per diluted share, a 21.4% increase as compared to $0.14 per diluted share in the first quarter of 2004. The effective tax rate for the first quarter of 2005 was 35.5% as compared to 39.5% in the first quarter of 2004. Weighted shares outstanding on a diluted basis for the first quarter of 2005 were 46,111,906 as compared to 45,142,033 for the first quarter of 2004.

Sandra Hatfield, DHB's Chief Operating Officer, said, "We are pleased with the Company's financial performance for the first quarter. The Company had its best first quarter ever with revenues of over $85 million. We continue to work hard to service our customers and provide them with the best possible body armor."

44. On July 28, 2005, DHB reported "record" results for the second quarter of 2005:

For the second quarter ended June 30, 2005, DHB reported revenues of $88,196,000 as compared to revenues of $86,066,000 in the second quarter of 2004. DHB was cash flow positive, generating $13,252,000 in cash from operations this quarter. During the second quarter of 2004, DHB was cash flow negative, using cash in operations of $16,257,000. Operating income was $12,642,000 as compared to $12,990,000 in the comparable year ago period. Income available to common stockholders was $7,598,000 as compared to $7,570,000 in the second quarter of 2004. Earnings per share was $0.17 per diluted share as compared to $0.17 per diluted share reported in the year-ago period. The effective tax rate was 35.5% as compared to 39.1% in the second quarter last year. Weighted shares outstanding on a diluted basis were 46,021,501 as compared to 45,739,277 in the comparable 2004 period.

Sandra Hatfield, the Company's Chief Operating Officer, said, "We continue to work very closely with our customers and partners to ensure that our products and services exceed their expectations. And despite ongoing industry-wide supply issues, we have continued to meet customer demand. I'm encouraged by the strong receptivity our products have received in the market place, and the steps we are taking to drive product innovation."

25

45.     The statements referenced above were materially false and misleading because

they failed to disclose the following facts, among others:

i.      The Company's body armor products containing Zylon were potentially
        dangerous because over time they fail to stop bullets due to Zylon-fiber
        degradation;

ii.     Because of the foregoing, the Company was subject to massive regulatory,
        criminal and civil liability; and

ii.     The Company's business was at risk given that its products containing Zylon were
        vulnerable to decertification from the National Institute of Justice (the "NIJ"),
        which would have a materially negative impact on the Company's business given
        that certification was required by many of DHB's customers.

### Individual Defendants' Insider Stock Sales

46.     During the Relevant Period, the Individual Defendants, mindful that the

Company's shares were being traded at artificially inflated prices as a result of their

misrepresentations and misstatements as alleged herein, sold more than a million shares of the

Company's stock for proceeds of over $58.9 million, as follows:

| | DATE | # OF SHARES | PRICE OF SHARES | PROCEEDS |
|---|---|---|---|---|
| **David H. Brooks** | | | | |
| *Chairman/CEO* | 12/1/2003 | 1,381,250 | $6.25 | $8,632,813 |
| | 11/29/2004 | 3,000,000 | $18.90 | $56,699,999 |
| | 11/29/2004 | 700,000 | $18.90 | $13,229,999 |
| | 12/22/2004 | 400,000 | $18.60 | $7,439,279 |
| | 12/23/2004 | 84,100 | $20.06 | $1,687,382 |
| | 12/27/2004 | 2,538,744 | $20.94 | $53,173,485 |
| | 12/28/2004 | 858,267 | $19.88 | $17,060,116 |
| | 12/29/2004 | 1,916,914 | $19.10 | $36,613,057 |
| | | *Total Shares:* | | *Total Proceeds:* |
| | | **10,879,275** | | **$194,536,130** |
| **Sandra Hatfield** | | | | |
| *Former COO/Director* | 11/29/2004 | 180,119 | $19.61 | $3,532,133 |
| | 12/28/2004 | 24,426 | $19.76 | $482,574 |
| | 12/29/2004 | 65,000 | $19.65 | $1,277,016 |
| | | *Total Shares:* | | *Total Proceeds:* |
| | | **269,545** | | **$5,291,723** |

| | | | | |
|---|---|---|---|---|
| **Dawn Schlegel**<br>*CFO/Director* | 11/29/2004 | 149,503 | $19.61 | $2,931,753 |
| **Gary Nadelman**<br>*Director* | 11/29/2004 | 102,374 | $19.61 | $2,007,554 |
| **Jerome Krantz**<br>*Director* | 11/30/2004<br>11/29/2004 | 31,050<br>85,176<br>*Total Shares:*<br>116,226 | $18.72<br>$19.61 | $581,256<br>$1,670,301<br>*Total Proceeds:*<br>$2,251,557 |
| **Cary Chasin**<br>*Director* | 11/29/2004<br>11/30/2004 | 46,496<br>62,000<br>*Total Shares:*<br>108,496 | $19.61<br>$18.57 | $911,786<br>$1,151,340<br>*Total Proceeds:*<br>$2,063,126 |
| **Barry Berkman**<br>*Director* | 11/29/2004<br>11/30/2004 | 32,120<br>12,500<br>*Total Shares:*<br>44,620 | $19.61<br>$18.79 | $629,973<br>$234,875<br>*Total Proceeds:*<br>$864,848 |

## Defendant Brooks' Improper Usage of the Company's Assets Expose DHB to Liability

47.    Over the years, defendant Brooks caused the Company to engage in transactions

with affiliates of defendant Brooks or his wife, Terry Brooks.   Certain of these transactions were

detailed in the Company's proxy statement filed on April 18, 2005 as follows:

> ■    In 2004, the Company paid Tactical Armor Products, Inc. or TAP, a
> company owned by Terry Brooks, the wife of defendant Brooks,
> approximately $17.6 million for purchases by the Company from TAP of
> certain components of the ballistic-resistant apparel that the Company
> manufactures and sells. TAP is also an approved subcontractor on certain
> of the Company's government contracts to perform sewing, but the cost of
> sewing was not a material portion of the Company's purchases from TAP
> during 2004.  In addition, the Company also permit TAP to manufacture
> certain products in a portion of the Company's manufacturing facility in
> Jacksboro, Tennessee, for which TAP paid the Company occupancy
> charges of approximately $39,600 in 2004.
>
> During 2004, the Company sold to TAP certain raw materials for
> approximately $6.6 million.

■   In 1997, the Compensation Committee adopted a resolution, the 1997 Resolution, granting to defendant Brooks the right to reimbursement for business and personal  expenses in an aggregate annual amount not to exceed 10% of   the Company's annual net income.   Under his employment agreement, the Company agreed to reimburse defendant Brooks for all expenses associated with a Florida residence and office owned by an affiliate of Mr. Brooks and expenses incurred in conducting business from his New York residence. In 2002, the Board of Directors adopted a resolution authorizing the Company to pay for all business trips related to the business use of an airplane owned by an affiliate of Mr. Brooks at a total cost not to exceed the cost of comparable charter services.

In 2004, the Compensation Committee formally repealed the 1997 Resolution, and the Audit Committee adopted a resolution, the 2004 Resolution, which specifically approved *payment or reimbursement for the fair rental value of the Florida residence and office, the corporate use of the New York residence, in a net amount equal to the fair rental value of the allocable portion of the New York residence used to conduct DHB business, and the business use of the plane belonging to Mr. Brooks's affiliate, at rates equivalent to comparable charter flights.*

In 2003, the Company did not reimburse defendant Brooks for certain expenses relating to the Florida residence and office, the corporate use of the New York residence and the business use of the plane belonging to defendant Brooks's affiliate in the aggregate amount of approximately $721,000. Also in the year 2003, a total of approximately $322,000 of personal expenses was charged by defendant Brooks to DHB credit cards. The net of these two amounts is approximately $399,000. During 2004, Mr. Brooks and his affiliates waived all rights to reimbursement in respect of such amount.

Pursuant to the 2004 Resolution, the Company paid an affiliate of Mr. Brooks charter fees for the use of a plane to fly the Company's executive officers and Board of Directors on business trips during 2004.   The Company paid direct expenses associated with the 2004 plane use to third party vendors that are not affiliated with defendant Brooks of approximately $696,000 for pilot pay, fuel and maintenance and reimbursed defendant Brooks' affiliate approximately $161,000 to bring the total cost of the plane trips to the comparable charter rate as determined by the Compensation Committee.   During 2004, the Compensation Committee approved the fair rental value payment of $25,000 per month for the cost of renting Mr. Brooks' Florida residence to formalize the provision in his employment contract which calls for the reimbursement of his Florida living expenses.   The Company paid direct

28

> expenses to unrelated third parties of approximately $171,000 during 2004 and reimbursed defendant Brooks' affiliate which owns the Florida residence, approximately $129,000 for 2004.

48.     Further, during 2004, defendant Brooks received approximately $70 million in compensation from the Company.  The Company also paid defendant Brooks approximately $93,000 in interest payments for certain loans, which bore an interest rate at 12% per annum, that the Company had taken from defendant Brooks.

49.     As a result of the above, currently the Company is the subject of an investigation by the Securities and Exchange Commission (the "SEC"), with respect to certain related party transactions and executive compensation matters regarding DHB and affiliates of defendant Brooks.

50.     As defendant Brooks continued to treat the Company as his own, unmistakably aware that the Company's prospect were not as promising as he and the other Officer Defendants were indicating to the Company's stockholders and the investing public, defendant Brooks was also slowly reducing his ownership interest in the Company.  Indeed, since 2003 Brooks has reduced his ownership interest in the Company from approximate 47% in 2003 to approximately 15% in 2005.

## The Individual Defendants Failed to Adequately Respond to Reports by DHB Auditors That There Were Significant Deficiencies in the Company's Internal Control

51.     Since 2002, the Company has engaged four separate independent accountants. On May 29, 2002, the Company dismissed its independent accountants, Paritz & Company P.A. ("Paritz").  Thereafter, the Company retained Grant Thornton LLP ("Grant Thornton") which served as the Company's independent auditors for the year ended December 31, 2002. However, on August 20, 2003, Grant Thornton notified the Company that it had decided to resign as the

29

Company's independent auditors. Specifically, Grant Thornton notified the Company that in connection with its audit of the Company's consolidated financial statements for the year ended December 31, 2002 for filing with the Company's Form 10-K/A for that year, *it identified certain deficiencies involving internal control that it considered to be significant deficiencies that, in the aggregate, constituted material weaknesses under standards established by the American Institute of Certified Public Accountants. These deficiencies included the failure to disclose certain related party transactions in the Company's Form 10-K for the fiscal year ended December 31, 2002, the Company's reliance on substantial outside assistance from outside professionals in preparing the Company's financial statements, and understaffing in the Company's accounting and finance department.* The Company's stated that its Audit Committee did not discuss these deficiencies with Grant Thornton before their resignation.

52. Thereafter, the Company hired defendant Weiser to serve as its independent auditor. On May 2, 2005, the Company issued an amended 10-K in which it revealed that defendant Weiser, which audited the Company's 2004 and 2003 financial statements included in the Company's Annual Report on Form 10-K, has issued an audit report on management's assessment of the Company's internal control over financial reporting (the "Weiser Audit Report"). The Weiser Audit report was dated March 16, 2005 and stated that defendant Weiser had identified two additional material weaknesses in the Company's internal controls: *(1) failure of the Company to complete consultation with Weiser LLP prior to filing Form 10-K for the year ended December 31, 2004; and (2) a need to enhance and strengthen the Audit Committee to improve the Committee's effectiveness.* The Company responded to the Weiser report by stating that it "believes that, to a significant degree, an evaluation of [those]two issues

30

involves subjective judgment and the Company does not agree that either of these matters constitutes a material weakness in internal control over financial reporting.

53.     Despite being informed by its two outside auditors for the past three years that it needed to enhance its internal controls, the Company has still blatantly resisted efforts to strengthen such controls. Indeed the Company has stated as follows with regard to its efforts to strengthen its internal controls:

> Under the supervision and with the participation of our CEO and CFO, our management has evaluated changes in our internal controls over financial reporting that occurred during our last fiscal quarter. Based on that evaluation, *our CEO and CFO did not identify any change in our internal controls over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.*

54.     However, as alleged herein, defendant Brooks is incapable of rendering disinterested supervision over efforts to strengthen the Company's internal controls since he actually benefits from weaknesses in such controls. Moreover, defendant Schlegel is beholden to defendant Brooks for her position as the Company's CFO given the control that defendant Brooks exerts over the Company's affairs. As a result defendant Schlegel too is incapable of supervising changes to the Company's internal controls.

55.     In addition, the Company's selection of Rachlin Cohen and Holtz LLP ("Rachlin") as its independent auditors for the year ending December 31, 2005 further affirms the Company's disinterestedness in remedying its internal controls.   This is because Rachlin was paid $234,831 in 2004 for consulting services in connection with assisting DHB in documenting internal control policies and $136,037 in audit fees to perform a re-audit of financial statements for the fiscal year ended December 31, 2002. However, as the recent Enron fiasco demonstrates (where Arthur Anderson provided both auditing and consulting services to Enron), there is a

31

potential conflict of interest when an accounting firm performs both auditing and consulting services for the same company.

## FIRST CAUSE OF ACTION
### (Against the Individual Defendants For Insider Selling, Misappropriation of Information and Abuse of Control)

56.     Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

57.     The Individual Defendants occupied positions within the Company that made them privy to confidential, proprietary information concerning DHB's financial condition and future business prospects. This information was a proprietary asset belonging to the Company. The Individual Defendants used this information to their own benefit. During the time that they had caused DHB's stock to be artificially inflated (from April 21, 2004 to August 29, 2005), the Individual Defendants, including a majority of DHB's board, collectively sold millions of dollars of DHB's stock. In so doing, these Individual Defendants misappropriated information that they had regarding the true status of DHB"s finances and used it for their personal financial benefit.

58.     At the time of their insider stock sales, the Individual Defendants knew that:

    i.    The Company's body armor products containing Zylon were potentially dangerous because over time they fail to stop bullets due to Zylon-fiber degradation;

    ii.    Because of the foregoing, the Company was subject to massive regulatory, criminal and civil liability; and

    iii.    The Company's business was at risk given that its products containing Zylon were vulnerable to decertification from the National Institute of Justice (the "NIJ"), which would have a materially negative impact on the Company's business given that certification was required by many of DHB's customers.

32

59.     The Individual Defendants also knew that when the above mentioned information became public, the market price of DHB's shares would decline. The Individual Defendants' sales of DHB stock, while in possession of this material, non-public information, constituted breaches of their fiduciary duties of loyalty and/or due care to the nominal defendant.

60.     The adverse, non-public material information regarding the Company's current and future earnings prospects was proprietary information belonging to DHB. In using their knowledge of the Company's undisclosed information to sell their personal holding of DHB at higher prices than they would otherwise have obtained, the Individual Defendants used the Company's proprietary information for personal gain, in breach of their fiduciary duties. Thus the Company is entitled to recover any profits the Individual Defendants received from their insider sales, beyond what they would have received if they had disclosed the adverse non-public information before selling their DHB stock.

61.     By reason of the foregoing, the Individual Defendants have caused the nominal defendant to suffer substantial harm, including some harm for which it has no adequate remedy at law.

### SECOND CAUSE OF ACTION
### (For Breach of Fiduciary Duty)

62.     Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

63.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, due care, good faith and fair disclosure, as alleged in this Complaint, DHB has been exposed to a significant risk of liability and damages, and loss of corporate goodwill.

64. As a result of the wrongful conduct alleged herein, the Individual Defendants are liable to the Company for breaches of their fiduciary duties.

### THIRD CAUSE OF ACTION
#### (Against Defendant Brooks for Unjust Enrichment)

65. Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

66. As alleged herein, defendant Brooks engaged in the following improper conduct: (i) he received excessive interest on loans he made to the Company, the amount of which was concealed from the SEC and the market; and (ii) he made $2 million in personal and other non-business charges using the Company's credit cards.

67. As a result, defendants Brooks was unjustly enriched at the expense of the Company.

68. By reason of the foregoing, defendant Brooks has caused the nominal defendant to suffer substantial harm, including some harm for which it has no adequate remedy at law. In addition, in taking the action complained of herein, defendant Brooks acted with fraud, malice and oppression, thus entitling DHB to an award of punitive damages.

### FOURTH CAUSE OF ACTION
#### (Derivative Action on Behalf of DHB Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

69. Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

70. The Director Defendants caused DHB to file a Proxy Statement with the SEC on November 24, 2004 (the "2004 Proxy Statement"). The Proxy Statement, which was circulated to DHB's shareholders, sought shareholder approval for, among other things, the reelection of six DHB directors: Brooks, Schlegel, Krantz, Nadelman, Chasin and Berkman.

34

71.     In the 2004 Proxy Statement, in an effort to induce DHB's shareholders to vote for, among other things, the reelection of the directors listed above, the Individual Defendants called attention to DHB's rising stock price, both in absolute terms and in relation to the broader market indices.     The Individual Defendants did so by inserting the table below which misleadingly indicated that the Company had outperformed both its peers and the market. The table indicates total return of the DHB common stock to stockholders for the five fiscal years ended December 31, 2004 as compared to the total return for the AMEX Market Index (the common stock trades on the American Stock Exchange) and the Security Protection Services Group Index, our peer group. The Company's common stock traded on the OTC Bulletin Board and the Boston Stock Exchange until February 1, 2002 when it began trading on the American Stock Exchange.   The table assumes $100 invested on December 31, 1999 (the last day of trading for the fiscal year ended December 31, 1999) in the common stock, the AMEX Market Index (the common stock began trading on the American Stock Exchange on February 1, 2002) and the Peer Group.  It assumes reinvestment of dividends.

|                       | 12/31/1999 | 12/29/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 | 12/31/2004 |
|-----------------------|-----------|-----------|-----------|-----------|-----------|-----------|
| DHB Industries, Inc.  | 100.00    | 243.46    | 827.77    | 230.94    | 973.85    | 2648.86   |
| Security/Protection   | 100.00    | 89.31     | 138.48    | 104.54    | 163.18    | 249.75    |
| AMEX Market Index     | 100.00    | 98.77     | 94.22     | 90.46     | 123.12    | 140.99    |

72.     The Director Defendants failed to include information which represented the true reason for DHB's stock price increases and acquiesced in allowing the above misleading information to be included in the 2004 Proxy Statement without regard to the fact that revelations concerning Zylon issues would have a material impact on the Company's performance.

35

73.     Further, in its 2004 Proxy Statement, in an effort to induce DHB's shareholders to ratify the appointment of Weiser as the Company's independent auditor, the Company stated that it had taken steps to address each of the deficiencies in internal control identified by Grant Thornton. However, that statement was a lie as established by Weiser's subsequent resignation in 2005 and statement that the Company still lacked internal control.

74.     The Director Defendants also cause DHB to file a Proxy Statement with the SEC on April 18, 2005 (the "2005 Proxy Statement"). The Proxy Statement, which was circulated to DHB's shareholders, sought shareholder approval for, among other things, the reelection of six DHB directors: Brooks, Schlegel, Krantz, Nadelman, Chasin, Berkman and Ellis.

75.     In the 2005 Proxy Statement, in an effort to induce DHB's shareholders to vote for, among other things, the reelection of the directors listed above, the Individual Defendants called attention to DHB's rising stock price, both in absolute terms and in relation to the broader market indices.     The Individual Defendants did so by inserting the table below which misleadingly indicated that the Company had outperformed both its peers and the market. The following table indicates total return of the DHB common stock to stockholders for the last five fiscal years ended December 31, 2004 as compared to the total return for the AMEX Market Index (the common stock trades on the American Stock Exchange) and the Security Protection Services Group Index, our peer group. The common stock traded on the OTC Bulletin Board and the Boston Stock Exchange until February 1, 2002 when it began trading on the American Stock Exchange. The table assumes $100 invested on December 31, 1999 (the last day of trading for the fiscal year ended December 31, 1999) in the common stock, the AMEX Market Index (the common stock began trading on the American Stock Exchange on February 1, 2002) and the Peer Group. It assumes reinvestment of dividends.

36

|                      | 12/31/1999 | 12/29/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 | 12/31/2004 |
|----------------------|-----------|-----------|-----------|-----------|-----------|-----------|
| DHB Industries, Inc. | 100.00    | 243.46    | 827.77    | 230.94    | 973.85    | 2648.86   |
| Security/Protection  | 100.00    | 89.31     | 138.48    | 104.54    | 163.18    | 249.75    |
| AMEX Market Index    | 100.00    | 98.77     | 94.22     | 90.46     | 123.12    | 140.99    |

76.    The Director Defendants failed to include information which represented the true reason for DHB's stock price increases and acquiesced in allowing the above misleading information to be included in the 2005 Proxy Statement without regard to the fact that revelations concerning Zylon issues would have a material impact on the Company's performance.

77.    The misstatements and omissions alleged above were material.  Had the truth been disclosed, DHB's shareholders may well have elected different directors.   Brooks knew or recklessly disregarded the misstatements or omissions in the Proxy Statements as alleged above, and the other Director Defendants should have known that the Proxy Statements contained misstatements and omissions as alleged above.

78.    DHB has been injured by the material misstatements in and omissions from the Proxy Statements.  DHB has no adequate remedy at law and is therefore entitled to equitable relief including, without limitation, an order setting aside the election of  defendants  Brooks, Schlegel, Krantz, Nadelman, Chasin, Berkman and Ellis pursuant to the 2004 and 2005 Proxy Statements.  Further, DHB is entitled to recover damages to compensate the Company for all damages resulting from the Directors Defendants' acts and omissions in violation of Rule 14a-9.

79.    This action was timely commenced within three years of the date of the 2004 and 2005 Proxy Statements and within one year from the time plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based.

## FIFTH CAUSE OF ACTION
**Against Defendant Weiser for Aiding and Abetting the Individual Defendants Breaches of Fiduciary Duty**

80.    Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

81.    Weiser aided and abetted the other defendants in breaching the fiduciary duties which they owe to DHB, as alleged herein.

82.    As a result of this aiding and abetting of the other defendants' breaches of fiduciary duty, DHB was harmed in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
**Against Defendant Weiser for Breach of Contract**

83.    Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

84.    Defendant Weiser and DHB were parties to a contract pursuant to which defendant Weiser agreed to provide audit services to DHB in accordance with GAAP and/or GAAS.

85.    Weiser breached its contract with DHB by failing to render services in accordance with GAAS and submitting and/or approving financial statements that were not prepared in accordance with GAAP.

86.    As a direct and proximate result of Weiser's breach of its contractual duty to the Company, DHB was harmed.

## SEVENTH CAUSE OF ACTION
**Against Defendant Weiser for Negligence**

87.    Plaintiff repeats and realleges all preceding paragraphs as if set forth in full herein.

38

88.     During part of the Relevant Period, Weiser, as the Company's auditor, owed to DHB the duty not to be negligent.

89.     As described herein, Weiser breached its duty not to be negligent by, among other things, failing to render services in accordance with GAAS, and/or failing to discover or correct material weaknesses in the Company's internal controls, and/or acting in a manner that was a departure from the ordinary standard of care for auditors.

90.     As a direct and proximate result of Weiser negligence, DHB was harmed.

**WHEREFORE,** plaintiff demands judgment as follows:

1.     determining that this action is a proper derivative action under Federal Rule of Civil Procedure 23.1;

2.     declaring that the Individual Defendants have breached their fiduciary duties to DHB;

3.     requiring the Individual Defendants to pay to DHB the amounts by which it has been damaged or will be damaged, which amount substantially exceeds $75,000, by reason of the conduct complained of herein;

4.     requiring the Individual Defendants to remit to DHB all of the millions of dollars of profit they made through selling their DHB shares into the inflated market they created;

5.     requiring defendant Brooks to reimburse DHB for the amount of damages sustained by the Company as a result of Defendant's Brooks unjust enrichment at the expense of the Company;

6.     requiring the Individual Defendants to pay statutory treble damages where applicable;

7. ordering that Individual Defendants and those under their supervision refrain from such further unlawful activities as are alleged herein and that they implement corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed and prevent their reoccurrence;

8. requiring defendant Weiser to account to DHB for the damages it incurred as a result of defendant Weiser's aiding and abetting the Individual Defendants in their breaches of fiduciary duties, defendant Weiser's breach of its contract with DHB; and its professional negligence with regard to the services it rendered to DHB;

8. awarding pre and post judgment interest, attorney's fees, expert fees and other costs, in an amount to be determined;

9. imposing a constructive trust for DHB's benefit on the profits the Individual Defendants received as a result of the breaches of fiduciary duties alleged; and

10. granting such other and further relief as the Court may find just and proper.

DATED: October 24, 2005                    THE BRUALDI LAW FIRM


Richard B. Brualdi (RB-1304)
Gaitri Boodhoo (GB-0643)
Sue Lee (SL-4305)
Jon Martino (JM-1504)
THE BRUALDI LAW FIRM
29 Broadway, Suite 2400
New York, NY 10016
(212) 952-0602

## **VERIFICATION**

I, Robert Garfield, am the Managing Partner of Lemon Bay Partners, LLP

("Lemon Bay"). I verify that I have reviewed the foregoing Verified Shareholder

Derivative Complaint and that the allegations as to Lemon Bay and its actions are true

and correct and the other allegations upon information and belief are true and correct.

Dated: October 21, 2005

_____
Robert Garfield